**Original filed 11/2/06**

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SONNY RAY HARDAWAY, | ) | No. C 02-1463 JF (PR) |
| | ) | |
| Petitioner, | ) | ORDER DENYING PETITION |
| | ) | FOR WRIT OF HABEAS |
| vs. | ) | CORPUS |
| | ) | |
| M. YARBOROUGH, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## INTRODUCTION

Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 1999 convictions in Alameda County Superior Court for a forcible lewd and lascivious act, kidnaping with intent to commit rape and rape by instrument, kidnaping of a child under the age of fourteen, and assault with intent to commit forcible penetration or a lewd act upon a child. For these crimes Petitioner was sentenced to 110 years to life in state prison.

This Court ordered Respondent to show cause why the petition should not be granted. Respondent filed an answer and memorandum of points and authorities addressing the merits of the petition, and Petitioner filed a traverse. After reviewing the papers and the trial record in its entirety, the Court concludes that Petitioner's claims are without merit and will deny the petition.

**BACKGROUND**

The California Court of Appeal summarized the underlying facts as follows:

On Monday, January 4, 1999, Jane [Doe] was 11 years old (nearly 12) and lived in an apartment in East Oakland near Arroyo Viejo Park. She decided that morning not to go to school and went to the park. Upon later reentering the park, a man she did not know (defendant) got up, walked past her and blew her a kiss. This scared her, but she walked on to a sandbox, sat and wrote names in the sand with a stick. She wore jeans and a T-shirt, and was four feet, 11 inches tall and weighed 105 or 110 pounds.

As she walked over to get a red stick, she noticed the same man sitting on a bench near the sandbox. He asked: "Have you ever made love? Can I make love to you? You want to be my girlfriend?" She told him no, and he told her at some point his name was Ray and he lived on 88th Avenue. After she told him no, he picked her up and carried her "like a baby," his hands under her buttocks, as she kicked and screamed, across the grass, down a dirt path and across a creek. At one point he cupped a hand over her mouth and told her to be quiet. Her ribs hurt. Defendant set her down on the other side of the creek, still holding one arm, and Jane kept screaming. Defendant was a Black man with a beard and mustache, dressed in black pants, a long-sleeve blue and black checkered shirt over a sleeveless black T-shirt (tank top), and white Adidas shoes with green and black stripes.

Defendant unbuttoned and unzipped Jane's jeans, pulled them down and put his hand on her private part – vagina – over the outside of her underwear, and Jane backed up to avoid this. Defendant then pulled down his own pants and his white boxer shorts with colored dots; he moved his hand up and down on his penis until "it got bigger" and then grabbed Jane's hand by the wrist and tried to make her touch it. She "snatched" her hand away. He pushed her down, bruising the side of her face, and she lay for a time on her back. Next he put his hand inside her underwear and touched her vagina. Jane "moved away," and he touched her breast outside her T-shirt. The assault ended when Jane, then on her knees, saw a "little Mexican boy" walking along the other side of the creek. Defendant got up and ran off, across a bridge and out of the park.

Jane pulled up and zipped her pants, walked back over the creek and path, and walked home, crying. She tearfully reported to a neighbor and then to her mom (foster mother) that a man had tried to rape her in the park. The neighbor called 911, and Officer Scott Wong and a partner responded at 11:50 a.m. Wong interviewed the still-hysterical Jane, broadcast a description of the assailant, and drove Jane around the park. Some five minutes after the broadcast, around 12:08 p.m., Officer Jimmy Wong stopped defendant several blocks away, on 88th Avenue. Jane was driven there and identified him as her assailant. He wore the same clothes and looked the same to her. He was arrested.

Jane identified defendant with certainty in a six-person physical lineup

held on January 31st, where he wore different clothes and had shaved his beard. She said he had changed his voice and removed his top front teeth. She identified him again at trial.

The People presented testimony from Angela C. of defendant's similar attack on her in 1982, when she was 18, in which he also robbed her of jewelry.

Defendant testified. He was impeached with 1982 convictions for the robbery and felony assault on Angela, for an assault on another woman, and for a 1988 robbery. His defense was a mixture of alibi and prosecutorial conspiracy. He insisted that he had been set up by police and the prosecution and that Jane had made up her story to disguise her problem of cutting school. He called his sister and niece, who said he lived with them at 88th Avenue and that he did not have false teeth.

Defendant's alibi was that he had been at a pawn shop hocking a bracelet when the crimes (supposedly) occurred and that he was arrested a short time later, for no reason.

Respondent's Ex. G (Unpublished Opinion of the California Court of Appeal, First Appellate District, People v. Hardaway, Nos. A090842 & A092541, Jul. 24, 2001) at 2-3.

Petitioner represented himself at trial and at his motion for a new trial. On appeal he was represented by counsel, but he also filed a pro se petition for writ of habeas corpus. In its opinion affirming the judgment of conviction the state appellate court also denied Petitioner's claims for habeas relief. Appellate counsel then filed a petition for review and Petitioner filed a pro se petition for writ of habeas corpus in the California Supreme Court. Both were summarily denied.

In this federal habeas corpus petition Petitioner raises the following claims, all of which are exhausted for the purpose of federal review: (1) the in-field identification procedure was unduly suggestive; (2) he was subjected to an illegal police interrogation; (3) the ineffective assistance of trial counsel; (4) the denial of his right to self-representation; (5) prosecutorial misconduct; (6) inadequate assistance by his court-appointed investigator; (7) judicial bias; (8) juror misconduct; (9) insufficiency of the evidence to support the convictions; (10) denial of the presentation of newly discovered exculpatory evidence; and (11) the ineffective assistance of

appellate counsel.

**DISCUSSION**

**A.    Standard of Review**

A federal habeas court will entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The court may not grant a petition with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  Id. § 2254(d)(1).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams v. (Terry) Taylor, 529 U.S. 362, 412-413 (2000).  "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

A federal court making the "unreasonable application" inquiry in a habeas case should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.  The "objectively unreasonable" standard does not equate to "clear

error" because "[t]hese two standards . . . are not the same.  The gloss of clear error fails to give

proper deference to state courts by conflating error (even clear error) with unreasonableness."

Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (citation omitted).  This standard of review,

however, does not relieve a federal court of review from its duty to examine and analyze the state

court's application of federal law.

A federal habeas court also may grant the writ it if concludes that the state court's

adjudication of the claim "resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

§ 2254(d)(2). The court must presume correct any determination of a factual issue made by a

state court unless the petitioner rebuts the presumption of correctness by clear and convincing

evidence.  28 U.S.C. §2254(e)(1).

In determining whether the state court's decision is contrary to, or involved an

unreasonable application of, clearly established federal law, a federal court looks to the decision

of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  It also looks to any lower court

decision examined or adopted by the highest state court to address the merits.  See Williams v.

Rhoades, 354 F.3d 1101, 1106 (9th Cir. 2004).  Where the state court gives no reasoned

explanation of its decision on a petitioner's federal claim and there is no reasoned lower court

decision on the claim, a review of the record is the only means of deciding whether the state

court's decision was objectively reasonable.  See Himes v. Thompson, 336 F.3d 848, 853 (9th

Cir. 2003).  When confronted with such a decision, a federal court should conduct "an

independent review of the record" to determine whether the state court's decision was an

unreasonable application of clearly established federal law.  Id.

If constitutional error is found, habeas relief is warranted only if the error had a

"'substantial and injurious effect or influence in determining the jury's verdict.'" <u>Penry v.</u>

<u>Johnson</u>, 532 U.S. 782, 795 (2001) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993)).

**B.     Petitioner's Claims**

      1.     <u>Unduly Suggestive In-Field Identification Procedure</u>

           a.     <u>Background</u>

Petitioner maintains that evidence that Jane Doe positively identified him at an in-field

show-up should not have been admitted at trial.  Specifically, he claims that the identification

procedure was unduly suggestive because he was handcuffed and standing with police officers.

At the preliminary hearing, during cross-examination by the attorney was who still

representing Petitioner at the time, Jane Doe testified that after the police had arrived and she had

described her assailant to them, they took her in the car with them.  They did not tell her there

was someone they wanted her to identify, but at some point the car stopped and the police asked

her whether she saw the man who had assaulted her.  She told them yes.  Defense counsel then

asked:

Q:     Now, that man was in the company of other police officers?

A:     Yes.

Q:     It was obvious?

A:     Yes.

Q:     And he was in handcuffs?

A:     Yes.

CT 69.

Jane also testified that there was no doubt in her mind that the man was her assailant, nor

was there a possibility that she was mistaken in her identification.  Id.  She stated that she recognized him both by his clothing and his face, and that he looked no different when he was with the police than when she had seen him before.  Id.

At trial Jane again testified about the identification.  She said that after she spoke with Officer Wong about the assault, he and another police officer drove her around the park where the incident occurred to look for the assailant, and then drove her to 88th and Holly, where she saw Petitioner with the police.  RT 211-12.  She said that Petitioner was wearing the same clothes he wore when he assaulted her, and that she recognized him by his face and his clothes, which she described in detail.  RT 212-14.  When asked whether anyone told her that the man on 88th was the same man who had assaulted her she replied "no."  RT 214.  She again said that she knew it was the same man because she recognized his face.  Id.

Officer Scott Wong, who was dispatched to respond to the 911 call made on Jane's behalf, testified that a few minutes after he broadcast the descriptive information of the assailant provided by Jane he received a radio communication from Officer Jimmy Wong to come to 88th Avenue.  When they arrived at the location he saw a patrol car, and Officer Jimmy Wong standing next to a man that matched the description Jane had given him.  RT 313.14.  Jane was "certain" when she said to him "That's the man."  RT 314.  On cross-examination Officer Scott Wong said that he did not see Petitioner handcuffed, nor had Jane Doe said to him that she saw Petitioner "handcuffed with a lot of police officers around."  RT 333-34.

Officer Jimmy Wong testified that at around 12:08 p.m., a few minutes after receiving a dispatch about the assault of Jane Doe, he was driving on 88th Avenue and saw a person who matched the description of the suspect.  RT 372.  He told Petitioner to stop, got out of his patrol car, and searched him.  Two more one-man patrol cars and an Oakland Police Ranger car arrived.

1  Then another car arrived, which Officer Jimmy Wong later learned was Officer Scott Wong's

2  car. Officer Scott Wong then radioed Officer Jimmy Wong, who placed Petitioner under arrest.

3  RT 374-75. On cross-examination Officer Jimmy Wong testified that when he was by himself

4  with Petitioner he had handcuffed him, but after he made sure that Petitioner had no weapons and

5  the first two patrol units and Oakland Police Ranger unit had arrived, he uncuffed Petitioner

6  because he "wanted to make sure [Petitioner was] unhandcuffed during the I.D. so it didn't

7  appear [he was] already a suspect." RT 386. Wong testified that Petitioner was not handcuffed

8  when Jane Doe identified him. Id.

9

10              b.    Applicable Federal Law

11

12      Due process protects against the admission of evidence deriving from impermissibly

13  suggestive pretrial identification procedures. Neil v. Biggers, 409 U.S. 188, 196 (1972). To

14  prevail on habeas review, a petitioner must show that the identification procedures used in the

15  case were "'so unnecessarily suggestive and conducive to irreparable mistaken identification that

16  he was denied due process of law.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995)

17  (quoting Stovall v. Denno, 388 U.S. 293, 301-02 (1967). If a challenged procedure is not

18  impermissibly suggestive, the inquiry into the due process claim ends. United States v. Bagley,

19  772 F.2d 482, 492 (9th Cir. 1985). But even if a pretrial procedure is impermissibly suggestive,

20  automatic exclusion of identification testimony is not required. See Manson v. Brathwaite, 432

21  U.S. 98, 113-14 (1977); Neil, 409 U.S. at 188. Identification testimony may properly be allowed

22  into evidence if under the totality of the circumstances the identification is sufficiently reliable.

23  See id.; Bagley, 772 F.2d at 492-93.

24

25      To determine whether the identification was sufficiently reliable to warrant admission,

26  the court weighs the indicia of reliability against the "'corrupting effect of the suggestive

27

28

identification procedure itself.'" Id. (quoting Manson, 432 U.S. at 114). Several factors which should be considered in evaluating the reliability of both in-court and out-of-court identifications are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Id.

> c.    Analysis

Under the totality of the circumstances, the admission of Jane Doe's identification testimony did not violate due process.

First, the one-on-one in-field show-up is a legitimate procedure to obtain an out-of-court identification. Bagley, 772 F.2d at 492-93. Moreover, "[t]he use of handcuffs or other indicia of custody will not invalidate a show-up, at least where necessary for the prompt and orderly presentation of the suspect, consistent with protection of the officers and witnesses." United States v. Kessler, 692 F.2d 584, 586 (9th Cir. 1982); see id. at 585-86 (show-up in which witnesses were confronted with handcuffed suspect not impermissibly suggestive); see also United States v. Jones, 84 F.3d 1206, 1209-10 (9th Cir.) (drive-by identification in which defendant was the only civilian surrounded by police officers was suggestive, but not impermissibly so), cert. denied, 519 U.S. 973 (1996); Bagley, 772 F.2d at 493 (post-arrest show-up in which witness saw defendant handcuffed and surrounded by police officers not impermissibly suggestive). Thus, whether Petitioner was handcuffed and surrounded by police is not the decisive factor, as long as Jane Doe's identification of him was reliable. Id.

Here, all of the indicia of reliability weigh in favor of admitting Jane's identification. First, she had ample opportunity to view Petitioner's face and clothing during the period of time

when he lifted her from the sandbox, carried her to the creek and assaulted her.  Second, it was likely that Jane paid good attention to Petitioner not only because she was under his control and in fear for her safety, but also because there were no other distractions – Petitioner was the only other person present during the entire encounter, and Jane was in a location with which she was familiar.  Third, Jane gave descriptions of Petitioner's physical characteristics and his clothing both to the 911 dispatcher and to Officer Scott Wong which were quite accurate.  Fourth, Jane expressed no hesitancy in identifying Petitioner as soon as she saw him on the street.  Finally, less than an hour had passed between the approximate time of Jane's assault and her identification of Petitioner, and he was seen walking on 88th Avenue, where the assailant had told Jane he lived.

Under the totality of the circumstances, Jane Doe's identification of Petitioner was sufficiently reliable that it cannot be said that the in-field identification procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identification" that Petitioner was denied due process of law.  Johnson, 63 F.3d 929.  Because the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, this claim for habeas corpus relief is denied.

    2.    Illegal Interrogation

        a.    Background

Following his arrest, Petitioner was interviewed by Detective Pete Sarna, who took a statement from him.  During pre-trial motions, the prosecutor, Mr. Barni, told the court that he did not intend to use the statement in his case-in-chief because he believed it to be inadmissible hearsay with no exceptions.  He also requested that Petitioner be instructed not to raise the topic of the "self-serving" statement before the jury.  RT 124.  Petitioner objected, making clear that he

wished to present to the jury the contents of the taped interview, in order to show that Detective Sarna had lied to him during the interview.  RT 124-26.  The court ruled that the tape could not be played for the jury, and that the admissibility of statements made by Detective Sarna at the interview for impeachment purposes would be ruled upon if the issue arose.  RT 126-27.

During his opening statement Petitioner referred to the interview and the court reminded him that he could not do so, explaining to the jury that Petitioner was referring to an out-of-court statement that was inadmissible hearsay.  Following a recess, Petitioner moved to play the taped interview in order to impeach Detective Sarna.  During a hearing outside of the presence of the jury, the court confirmed that the prosecutor did not intend to call Detective Sarna as a witness, at which point Petitioner said that he planned to do so.  RT 393-94.  The court then asked Petitioner to make an offer of proof as to the relevance of Detective Sarna's testimony.  RT 395.

On the stand Detective Sarna admitted that he had lied to Petitioner during the course of the interview, telling Petitioner that the victim had been raped, that the police had DNA evidence identifying Petitioner as the perpetrator, and that the police had a Mexican witness who could identify Petitioner.  Detective Sarna explained his use of tactics, saying,

> Yes, your honor, those are simple techniques during an interview that were only used during that interview.  Nowhere in any police report did I fabricate and say that I had DNA evidence to get the case charged.  It's just a simple ruse technique confronting a potential suspect that yes, we have someone who saw you do it, and that's the only time that it was used.  It was never documented, it was never in a police report saying that was a fact.  It was not considered by the district attorney for charging purposes at all.

RT 402-03.

The court noted that Detective Sarna had lied during the interview, but that such evidence was not relevant to the case, and explained that Petitioner must still show what relevant evidence he hoped to elicit from Detective Sarna at trial.  RT 404-07.  Petitioner continued to focus on the

fact that Detective Sarna had lied.  The court then ruled that Petitioner had failed to show that

there was relevant testimony he wished to elicit from Detective Sarna that could then be

impeached by playing the tape of the interview for the jury.  RT 408-09.  Therefore, the tape

would not be admitted into evidence.  RT 409.  During trial Petitioner again moved to present the

tape, and the court rejected the request.  During his testimony Petitioner referred to the taped

interview, and the court sustained the prosecutor's hearsay objection when Petitioner attempted

to recount what he had been told during the interview.  RT 606.

Petitioner made identical motions for a new trial and for a mistrial in which he claimed

that the exclusion of the taped statement denied him due process.  The court rejected these

arguments because of its prior rulings that the statements were inadmissible hearsay.  RT 843.

At no time during trial or in post-trial motions did Petitioner argue that his <u>Miranda</u> rights had

been violated by Detective Sarna during the interview.  The first time Petitioner raised this

argument was in his pro se state habeas corpus petition, which the California Court of Appeal

summarily denied.

b.    <u>Applicable Federal Law</u>

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that a suspect

subjected to custodial interrogation must first be advised that he has the right to remain silent,

that statements made can be used against him, that he has the right to counsel, and that he has the

right to have counsel appointed.  These warnings must precede any custodial interrogation, which

occurs whenever law enforcement officers question a person after taking that person into custody

or otherwise significantly depriving a person of freedom of action.  <u>See</u> <u>Miranda</u>, 384 U.S. at

444.  If the suspect indicates a request for counsel, "the interrogation must cease until an attorney

is present."  Edwards v. Arizona, 451 U.S. 477 (1981).

Miranda provides for warning requirements effective to secure the Fifth Amendment's privilege against self-incrimination.  The remedy for a violation of these requirements is the suppression, at the subsequent trial, of the statements made incriminating the defendant in the crime about which he was questioned.  Miranda,  384 U.S. at 479; see Jackson v. Giurbino, 364 F.3d 1002, 1009-10 (9th Cir. 2004) (because Miranda offers a "bright-line" test for the admissibility of statements made in response to police interrogation, state courts act contrary to clearly established constitutional law when they fail to exclude statements obtained in violation of Miranda).  The requirements of Miranda are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d).  Juan H. v. Allen, 408 F.3d 1262, 1271 (9th Cir. 2005).

      c.     Analysis

Petitioner argues that he is entitled to habeas relief because he asked for a lawyer during the course of his interview with Detective Sarna but his request was denied.  This claim is without merit.  Even if Petitioner's right to counsel was violated during the interview, the record makes abundantly clear that, despite Petitioner's repeated requests to have the tape of the interview played to the jury in its entirety, no statement made by Petitioner during the interview was admitted at trial, and no reference to the contents of the interview was made other than by Petitioner.  Because no incriminating statements made by Petitioner during the interview were admitted against him at trial in violation of Miranda, no due process violation occurred.  Therefore, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, and this claim for habeas corpus relief is denied.

      3.     Ineffective Assistance of Counsel

Petitioner claims that he was denied the effective assistance of counsel before and during

his preliminary hearing.  For the reasons discussed below, the Court finds that the state court's

rejection of this claim was not contrary to, or an unreasonable application of, clearly established

federal law.  Therefore, this claim for habeas corpus relief is denied.

        a.    <u>Background</u>

On January 15, 1999 attorney Marvin E. Levy was appointed to represent Petitioner at

trial.  CT 191.  On January 25, 1999 Mr. Levy requested a physical lineup pursuant to <u>Evans v.

Superior Court</u>, 11 Cal. 3d 617 (1974).  <u>Id.</u>  On January 26 the motion was granted, with an order

to hold the lineup before the preliminary hearing.  <u>Id.</u>

On January 31, 1999 a physical lineup was held at the police department.  CT 191.

Petitioner was allowed to select the five other participants and arrange their order in the lineup.

<u>Id.</u>  The victim, Jane Doe, identified Petitioner.  Mr. Levy and his paralegal sat in the audience

and observed the lineup.

On February 1, 1999 the preliminary hearing was held.  CT 5.  The prosecution presented

Jane Doe as its only witness.  CT 9-80.  Jane identified Petitioner in court as her attacker.  CT 36.

She was questioned by the prosecutor and Mr. Levy.  CT 9-80.  After the prosecutor rested, Mr.

Levy said he did not wish to offer any evidence.  CT 80-81.  Mr. Levy noted, however, that

Petitioner insisted on testifying and that if he did so it was over Mr. Levy's objection.  CT 81.

The trial court advised Petitioner that he had "a very experienced, very able lawyer representing

[him] in this matter."  <u>Id.</u>  The court suggested that Petitioner talk with Mr. Levy and make sure

he understood the potential consequences of taking the stand.  <u>Id.</u>

After the lunch recess Petitioner made a motion to substitute counsel, pursuant to <u>People

v. Marsden</u>, 2 Cal. 3d 118 (1970).  The motion was heard and denied.  CT 84.  The court,

however, granted Petitioner's motion to represent himself pursuant to <u>Faretta v. California</u>, 422

1  U.S. 806 (1975). CT 84. Petitioner took the stand and testified regarding an alibi defense. CT

2  85-104. After hearing argument, the court held Petitioner to answer on the charges in the first

3  amended complaint. CT 113-15.

4      At trial, Petitioner called Mr. Levy as a defense witness, apparently to show that

5  incompetence and/or conspiratorial intent by Mr. Levy had contributed to the prosecution's case

6  and the evidence against Petitioner. On direct examination, Petitioner questioned Mr. Levy

7  about whether he had followed through as promised by delivering requested documents to

8  Petitioner at the jail, including the police report; whether Mr. Levy had adequately represented

9  Petitioner's interests when he requested a physical lineup and during the lineup; whether Mr.

10  Levy had adequately investigated the matter of whether Petitioner wore false teeth; and whether

11  Mr. Levy had adequately investigated the crime scene and spoken to possible witnesses. RT 644-

12  666.

13          b.      Applicable Federal Law

14      A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

15  Amendment right to counsel, which guarantees not only assistance, but effective assistance of

16  counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any

17  claim of ineffectiveness must be whether counsel's conduct so undermined the proper

18  functioning of the adversarial process that the trial cannot be relied upon as having produced a

19  just result. Id. The right to effective assistance of counsel applies to the performance of both

20  retained and appointed counsel without distinction. See Cuyler v. Sullivan, 446 U.S. 335, 344-

21  45 (1980).

22      In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner

23  must make two separate showings. First, he must establish that counsel's performance was

deficient, that is, that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

The Strickland framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. See Williams (Terry) v. Taylor, 529 U.S. 362, 404-08 (2000).

      c.     Analysis

      (1)     Failure to conduct adequate investigation

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. See Strickland, 466 U.S. at 691. Counsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client. Avila v. Galaza, 297 F.3d 911, 924 (9th Cir. 2002). However, where the decision not to investigate further is taken because of reasonable tactical evaluations, the attorney's performance is not constitutionally deficient. See Siripongs v. Calderon, 133 F.3d 732, 734 (9th Cir. 1998). Strickland directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 491).

Petitioner claims that Mr. Levy was ineffective because he failed to interview certain

witnesses and to obtain certain evidence.  In particular, he contends Mr. Levy failed to interview Jane Doe's teacher and doctor and to obtain copies of Jane Doe's "medical and school grade record" from them; failed to interview the doctors who gave Jane Doe the sexual assault examination at the hospital and obtain a report from them; failed to interview all three of the pawn shop workers and to obtain copies of the pawn shop receipt and the pawn shop video camera tape of January 4, 1999; and failed to find and interview Kenitra Gayle Lewis Frazier – the person he claimed he asked to pawn something for him at the time of the assault – and to obtain a copy of her pawn shop ticket.

The duty to investigate and prepare a defense does not require that every conceivable witness be interviewed.  Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995).  A defendant's mere speculation that a witness might have given helpful information if interviewed is not enough to establish ineffective assistance.  See Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001).  To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witness's testimony would have created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner.  Alcala v. Woodford, 334 F.3d 862, 872-73(9th Cir. 2003).

The failure to present probative, noncumulative evidence in support of a chosen defense strategy is not deficient performance if there exists a reasonable tactical justification.  Id. at 871-72.  A habeas petitioner has the burden of showing through evidentiary proof that counsel's performance was deficient.  See Toomey v. Bunnell, 898 F.2d 741, 743 (9th Cir.), cert. denied, 498 U.S. 960 (1990); see also Rios v. Rocha, 299 F.3d 796, 813 n.23 (9th Cir. 2002) (rejecting two ineffective assistance of counsel claims based on petitioner's failure to produce evidence of

prejudice).

With respect to Jane Doe's teacher and doctor and the doctors who examined Jane Doe at the hospital, Petitioner has failed to explain how interviews of these witnesses or Jane Doe's school grade and medical reports would have benefitted him at the preliminary hearing, when he was still represented by counsel, or at trial. Moreover, Petitioner did have access to the medical report prepared following Jane Doe's sexual assault examination. No doctor was called to testify at trial by either side.

With respect to the pawn shop workers and Kenitra Frazier, Petitioner claims that they could have presented testimony relevant to his alibi defense, that is, that he was at the pawn shop at the time of the assault. However, he does not establish that their testimony would have benefitted him at the preliminary hearing, nor has he shown how counsel's failure prejudiced him at trial. That is, Petitioner was not prevented from contacting and interviewing these witnesses simply because counsel had failed to do so. The record shows that during discovery the prosecution provided Petitioner with the receipt from the pawn shop signed by Kenitra Frazier, including personal information about her, CT 188, and with an inspector's report of a telephone interview with Kenitra Frazier, CT 209. Also, an investigator appointed to assist Petitioner after he was granted leave to proceed in pro per was actively pursuing Kenitra Frazier's whereabouts just prior to trial but had not been able to find her, and Petitioner agreed to start the trial without her. RT 9. Similarly, counsel's failure to call the pawn shop employees at the preliminary hearing did not prevent Petitioner from contacting and interviewing them prior to trial, and Petitioner in fact called one of the employees, Yolanda Johnson, to testify at trial. RT 579.

Petitioner also claims that Mr. Levy was ineffective because he failed to obtain the DNA reports from the police. However, the record establishes that although samples were taken from

Petitioner, no tests were ever run on the samples or reports prepared.  Petitioner has failed to provide any evidence that this was not the case.

Finally, Petitioner claims that Mr. Levy failed to investigate his alibi defense.  However, Mr. Levy's testimony at trial shows that he visited the crime scene three times before the preliminary hearing, and that he obtained a statement from David James, the park employee who was working the day of the assault.  He also spoke with the neighbor who had called the police after Jane Doe reported she had been assaulted.  RT 655, 666.  Moreover, Petitioner has not shown how further investigation of the alibi defense by counsel would have led to a different result at the preliminary hearing or at trial, where in both instances Petitioner took the stand as a witness and asserted his defense.

(2)   Failure to file motions

Petitioner claims that Mr. Levy was ineffective because he refused to file motions challenging the suggestive identification procedure and Petitioner's unlawful interrogation.

A lawyer need not file a motion that he knows to be meritless on the facts and the law.  Put simply, trial counsel cannot have been ineffective for failing to raise a meritless motion. Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005); see Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999) (to show prejudice under Strickland from failure to file a motion, petitioner must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him).

As discussed above, Petitioner's challenges to the identification procedure and his interrogation are without merit.  Accordingly, counsel's failure to file motions regarding these matters was not deficient performance.

(3)   <u>Lineup request</u>

Petitioner alleges that Mr. Levy provided ineffective assistance because he requested a physical lineup weeks after Petitioner's arrest, and the lineup was held the day before the preliminary hearing.  Other than these assertions, however, Petitioner does not state how he was prejudiced by these facts.  On its face, this conclusory claim is without merit.  During pre-trial proceedings, however, Petitioner moved for dismissal of the charges against him because he maintained that Mr. Levy had conspired with the prosecutor, police and Jane Doe to produce an unfair lineup.  Therefore, the Court will also consider whether there might be merit to the claim that Mr. Levy provided ineffective assistance for that reason.

The trial court held an evidentiary hearing on Petitioner's motion to dismiss, and Mr. Levy was called as a witness.  RT 52.  He testified that he had decided to request a physical lineup after consulting with the attorney who had first represented Petitioner before he had to withdraw because of a conflict of interest.  RT 58, 68.  During questioning, Petitioner focused on the role Mr. Levy had played at the lineup, that is, whether he had actively represented Petitioner's interests by keeping an eye on Jane Doe and her interactions with the police officers and the district attorney who were present, or whether he had allowed and/or conspired with the police and the district attorney to tell Jane Doe whom to identify as her assailant at the lineup and at the preliminary hearing.  RT 53-64, 91.  Other witnesses were called as well, and the court watched a tape of the lineup.  The court ruled that the lineup was fairly conducted, and,

> I find also that from the testimony Mr. Levy behaved and comported himself in a manner consistent with that of a competent defense attorney.  I find no evidence at all of collusion between Mr. Levy and the prosecution and law enforcement to deprive Mr. Hardaway of due process rights.

RT 93.

At trial, Mr. Levy testified again about the lineup, stating that it was his idea, which he

presented to Petitioner to see if Petitioner would approve or if he thought it was a good idea.  RT 646-47.  He also testified about what he believed to be his role at a lineup – to observe and to speak up if he thinks something is improper or unfair.  658-59.  He explained that he would observe whether people are talking to the victim, whether the people in the lineup look fairly reasonable, whether the victim talks to anybody, and what the victim's reaction would be as the people in the lineup come in.  RT 667.  He testified about who had been in the audience at the lineup, the nature of his prior acquaintances, if any, with the police officers and district attorney who had been present at the lineup, and his lack of interaction with them during or after the lineup.  RT 644-667.

Based upon this record, this Court finds no merit to Petitioner's claim that Mr. Levy's decision to request a physical lineup and his behavior during and after the lineup amounted to the ineffective assistance of counsel.

### (4)   Cross-examination and credibility of Jane Doe

Petitioner claims that Mr. Levy was ineffective because he failed to adequately cross-examine Jane Doe at the preliminary hearing, and because he testified at trial that he found her to be a credible witness.

The record of the preliminary hearing shows that the length of the prosecution's and the defense's examinations of Jane Doe were approximately the same.  On cross-examination by the prosecutor at trial, Mr. Levy testified that he had questioned Jane Doe in a way that he believed was appropriate for a child of her age, RT 661, and when asked by the prosecutor whether he had found Jane Doe to be a credible witness, he replied, "Yes."  RT 662.  Petitioner did not object.  Rather, on redirect examination, he asked Mr. Levy, "Do you think that Jane Doe was telling you the truth?"  RT 663.  Mr. Levy asked Petitioner, "You want me to answer that?"  Id.  Petitioner

said, "Yes." <u>Id.</u>  The court interjected, "Mr. Hardaway, I think that Mr. Levy's opinion of credibility is not relevant to this case." <u>Id.</u>

Petitioner has not explained how Mr. Levy's cross-examination of Jane Doe was deficient or specified what questions should have been asked, such that the result of the preliminary hearing would have been different.  Nor has he explained how the cross-examination could have affected the outcome of his trial, especially since he questioned Jane Doe at length at trial.  Petitioner also has not explained how Mr. Levy's testimony at trial could have amounted to ineffective assistance of counsel, when at the time Mr. Levy testified he no longer represented Petitioner.  These claims are without merit.

(5)     Conversation about Petitioner's teeth

The question whether Petitioner had false teeth was relevant to the fact that Jane Doe did not tell police that her attacker was missing any teeth, but when Petitioner was identified in the lineup by Jane Doe she said he was missing his top front teeth.  Petitioner claims that at some time prior to the preliminary hearing Mr. Levy called to speak with Petitioner's wife and told her that Petitioner had said something about taking out his false teeth, but Petitioner's wife told Mr. Levy that Petitioner didn't have false teeth.  Petitioner's claim seems to be that Mr. Levy's failure to further investigate and develop the issue of the false teeth at the preliminary hearing amounted to the ineffective assistance of counsel.  When questioned by Petitioner at trial, Mr. Levy testified that he vaguely remembered talking with Petitioner's wife about Petitioner's teeth, but it did not seem particularly important at the time.  RT 648.

Petitioner has not shown that counsel's performance prejudiced his ability to obtain a fair preliminary hearing or trial.  Petitioner took the stand on his own behalf at the preliminary hearing and was not prevented from presenting testimony about any discrepancies between Jane

Doe's description of the assailant and his appearance.  Moreover, at trial he presented several

witnesses, each of whom testified that he did not own false teeth, and he argued his theory of

misidentification during closing argument.

For the foregoing reasons, Petitioner's claim of ineffective assistance of trial counsel is

denied.

### 4.    Denial of the Right to Self-Representation

#### a.    Background

Petitioner claims that he was denied the right to represent himself because of various

evidentiary and procedural rulings the trial court made, and admonitions the court gave to him

about how to conduct himself during trial.

#### b.    Applicable Federal Law

A criminal defendant has a Sixth Amendment right to self-representation.  See Faretta v.

California, 422 U.S. 806, 832 (1975).  This right exists despite the fact that, in most cases, a

defendant would be better served by counsel.  Id. at 834.  While a trial judge may doubt the

quality of representation that a defendant may provide for himself, the defendant must be allowed

to exercise his right to self-representation so long as he knowingly and intelligently waives his

right to counsel and is able and willing to abide by rules of procedure and courtroom protocol.

See McKaskle v. Wiggins, 465 U.S. 168, 173 (1984).  A trial court may refuse to permit a

criminal defendant to represent himself when he is "not able and willing to abide by rules of

procedure and courtroom protocol."  Savage v. Estelle, 924 F.2d 1459, 1463 (9th Cir. 1991).  But

a criminal defendant's unfamiliarity with the rules of evidence or the specifics of criminal

procedure, without severely disruptive behavior, is not sufficient to override his right of self-

representation.  See United States v. Lopez-Osuna, 242 F.3d 1191, 1200 (9th Cir. 2001).

c.     Analysis

The record is clear that Petitioner requested and was granted the right to represent himself midway through the preliminary hearing.  The objections he raises now do not go to the question whether the judge's decision to do so was proper.  Rather, they pertain to court rulings and admonitions which he maintains prejudiced his ability to exercise his right to self-representation. Having reviewed the state court record in its entirety, this Court finds no merit to Petitioner's claim.  The trial court's evidentiary and procedural rulings were based on basic legal concepts which are applicable to pro se and represented litigants alike.  In fact, it is clear from the record that the trial court took great care to address in detail all evidentiary matters raised by Petitioner, even those which might have been resolved in a more perfunctory manner.  Similarly, the record shows that the court's admonitions to Petitioner were few and far between, even though Petitioner at times persisted in ignoring the court's rulings pertaining to what evidence could be admitted or argued to the jury, or the proper demeanor to be used when questioning a witness, such as the minor victim Jane Doe.  The state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, this claim for habeas corpus relief is denied.

5.     Prosecutorial Misconduct

a.     Background

In post-trial motions for a new trial and for a mistrial Petitioner claimed that the prosecutor committed misconduct by suborning perjury of witnesses (including Jane Doe), presenting false evidence, refusing to provide Petitioner with discovery, and attempting to influence the jury.  The trial court held a hearing on the motions at which both Petitioner and the prosecutor argued.  The court then denied the motions summarily.  In the present petition,

Petitioner asserts several grounds for prosecutorial misconduct, all of which this Court finds to be without merit, as discussed below.

b.   <u>Applicable Federal Law</u>

Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power.  <u>See</u> <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986).  The right to due process is violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  <u>See</u> <u>id.</u>; <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Claims of prosecutorial misconduct are reviewed on the merits, examining the entire proceedings to determine whether the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  <u>Johnson v. Sublett</u>, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation marks and citation omitted).

c.   <u>Analysis</u>

For the following reasons, the Court finds that the state court's rejection of Petitioner's prosecutorial misconduct claim was not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, this claim for habeas corpus relief is denied.

(1)   <u>Perjury and false evidence</u>

Petitioner claims that the prosecutor suborned perjury of witnesses and presented false evidence because: (1) he coached Jane Doe to lie while she was testifying; (2) he introduced false evidence, including Petitioner's clothes and falsified pawn shop receipts; and (3) he used perjured testimony from three police officers, Yolanda Johnson, and Mr. Levy.

When a prosecutor obtains a conviction by the use of testimony which he knows or

should know is perjured it has been held consistently that such conviction must be set aside if

there is any reasonable likelihood that the testimony could have affected the judgment of the jury.

United States v. Agurs, 427 U.S. 97, 103 (1976).  But prosecutors will not be held accountable

for discrepancies in testimony where there is no evidence from which to infer prosecutorial

misconduct.  See United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995).  A factual

basis for attributing knowledge to the government that the testimony was perjured must be

established.  See Morales v. Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004).  To prevail on such

a claim the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the

prosecution knew or should have known that the testimony was actually false, and (3) the false

testimony was material.  Zuno-Arce, 339 F.3d at 889.  A habeas petitioner must also show

whether there was "any reasonable likelihood" that the false evidence could have affected the

jury's judgment.  Id.

　　　Petitioner's allegations are unsupported by the record or any identifiable  evidence

outside the record.

With respect to the testimony of Jane Doe and the other witnesses, Petitioner has shown only that

there were discrepancies in their testimony.  Petitioner ably brought these discrepancies to the

attention of the jury, which was responsible for making the ultimate determinations regarding

witness credibility.

　　　With respect to the introduction of Petitioner's clothing at trial, the prosecutor called

several witnesses to establish a chain of custody and control over the clothing from the time

Petitioner was arrested until it was admitted into evidence at trial.  Petitioner had the opportunity

to question these witnesses, and he did so.  In fact, Petitioner's argument at trial was that the

clothing was his and that it did not match the descriptions given by Jane Doe.

With respect to the pawn shop receipt, Petitioner continues to assert that the prosecutor engaged in misconduct by fabricating various pawn shop receipts in order to refute evidence which showed that Kenitra Frazier pawned Petitioner's bracelet at 11:43 a.m. on January 4, 1999 – which would have made it impossible for him to have assaulted Jane Doe according to the prosecutor's time line.  However, in opposition to Petitioner's new trial motion the prosecutor aptly described the relevance of the various pawn shop receipts disclosed to Petitioner during pretrial discovery.  This information was obtained from Yolanda Johnson, the pawn shop employee who testified as a defense witness at trial: (1) the pawn shop's copy of the receipt signed by Kenitra Frazier when she pawned the bracelet on January 4, 1999 is kept in a receipt book; (2) the signed pawn receipt has a time stamp which appears to be 12:01 p.m.; (3) the clock on the computer which generated the pawn receipt was forty minutes fast on March 3, 1999; (4) the clock on the computer had not been reset between January 4 and March 3; (5) the copy of the pawn receipt for the Frazier transaction which was printed on <u>January 5, 1999</u> and provided to Detective Sarna is not a true and accurate reproduction of the pawn shop's copy of the pawn receipt – it is not signed by Kenitra Frazier and it has a time stamp of 11:43 a.m., which relates to the time (still forty minutes fast) that it was printed for Detective Sarna, not to the time of the transaction on January 4.  CT 433.  Thus, as established by the receipts and the testimony of Yolanda Johnson at trial, the pawn receipt time stamped 12:01 p.m. on January 4, 1999 reflects that Kenitra Frazier pawned the bracelet forty minutes earlier, at 11:21 a.m., not at 11:43 a.m., as Petitioner argues.  CT 433-34.  Petitioner's claim is without merit.

(2)    <u>Failure to provide discovery and misrepresentations</u>

Petitioner claims that the prosecutor refused to provide Petitioner with the DNA results from samples taken from him following his arrest.  As discussed earlier in this order, the record

establishes that although samples were taken from Petitioner, no tests were ever run on the samples or reports prepared.  Petitioner has failed to provide any evidence that this was not the case.

Petitioner also claims that the prosecutor failed to provide him with the contents of the conversation between Kenitra Frazier and Detective Sarna.  However, the record shows that Petitioner was provided with a summary of the conversation, and Petitioner has not shown that a tape or transcript of the conversation actually existed and was in the prosecutor's possession.  He also has not shown how the failure to provide him with such so infected the trial with unfairness as to make the resulting conviction a denial of due process.

Finally, Petitioner claims misconduct because the prosecutor told the court that Kenitra Frazier was in Los Angeles.  This claim is meritless.  Petitioner has presented no evidence that this information was false or, if it was, that the prosecutor knew or should have known that was the case.  Similarly without merit are Petitioner's claims of misconduct because the prosecutor asked for the amount of Petitioner's bail to be raised and asked the court to exclude evidence Petitioner attempted to admit in connection with his examination of Yolanda Johnson, the pawn shop employee.

(3)    <u>Improper jury interaction</u>

Petitioner claims misconduct by the prosecutor during a readback, when the judge was out of the room and the prosecutor told the jurors that if they had any questions they should send him a note and he would go up to the jury room to answer them.  In response, Respondent points to the portion of the record where this occurred and notes: "It is clear that the comments quoted by petitioner were actually made by the trial court, but were incorrectly attributed to the prosecutor by the court reporter.  RT 778."  (Respondent's Memorandum of Points and

Authorities in Support of Answer to Order to Show Cause at 20:14-15.)  This Court has reviewed the noted section and agrees with Respondent's assessment.  In any event, the record does not show that the prosecutor ever answered any questions from the jury.

For these reasons, Petitioner's prosecutorial misconduct claim is denied.

6.  <u>Inadequate Private Investigator</u>

a.  <u>Background</u>

Petitioner claims that Robert Cross, the private investigator appointed by the trial court to assist Petitioner, conducted an inadequate investigation because he did not subpoena witnesses and documents that Petitioner requested.

b.  <u>Applicable Federal Law</u>

There is no clearly established United States Supreme Court authority requiring that indigent defendants who represent themselves be provided with investigative services.  In fact, the Supreme Court has specifically declined to decide that question.  <u>See</u> <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 323 n.1 (1985).  Moreover, the Court recently clarified that <u>Faretta v. California</u>, 422 U.S. 806 (1975), which established the right to self-representation under the Sixth Amendment, does not clearly establish a right to law library access or any other specific legal aid that must be afforded to a criminal defendant who has chosen to represent himself.  <u>See</u> <u>Kane v. Garcia Espitia</u>, 126 S. Ct. 407, 408 (2005).

c.  <u>Analysis</u>

Petitioner cannot establish that the state court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law because the Supreme Court has not recognized a constitutional right to investigative assistance for criminal defendants.  <u>See</u> <u>Stevenson v. Lewis</u>, 384 F.3d 1069, 1071 (9th Cir. 2004) (if there is no Supreme Court precedent

that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law). Accordingly, this claim for habeas corpus relief is denied.

### 7. Judicial Misconduct

#### a. Background

Petitioner claims that the trial judge was unfair and impartial because she excluded evidence he wanted to present, excluded two investigators from the trial, did not allow him to leave his seat to present his case, did not allow him to question Jane Doe about the clothing presented at trial, did not allow him to recall any witnesses, and did not allow him to question his sister and his wife about their conversation with a police officer.

#### b. Applicable Federal Law

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge. See In re Murchison, 349 U.S. 133, 136 (1955). In some cases, the proceedings and surrounding circumstances may demonstrate actual bias or an appearance of advocacy on the part of the judge amounting to improper conduct. See Taylor v. Hayes, 418 U.S. 488, 501-04 (1974). But judicial rulings alone almost never constitute a valid basis for bias or partiality, as they "can only in the rarest circumstances evidence the degree of favoritism or antagonism required" for such a showing. Liteky v. United States, 510 U.S. 540, 555 (1994).

Similarly, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings . . . do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Id. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a

bias or partiality challenge.  Id.  These include expressions of impatience, dissatisfaction,

annoyance and even anger.  Id. at 555-56.  In short, "[a] judge's ordinary efforts at courtroom

administration – even a stern and short-tempered judge's ordinary efforts at courtroom

administration – remain immune."  Id. at 556.

A claim of judicial misconduct by a state judge in the context of federal habeas review

does not simply require that the federal court determine whether the state judge committed

judicial misconduct; rather, the question is whether the state judge's behavior "rendered the trial

so fundamentally unfair as to violate federal due process under the United States Constitution."

Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted), cert. denied, 517 U.S.

1158 (1996).

c.    Analysis

Petitioner's challenges to the trial judge's evidentiary and procedural rulings and her

admonitions to Petitioner do not support a claim for judicial misconduct.  As noted earlier in this

order, "The court's evidentiary and procedural rulings were based on basic legal concepts which

are applicable to pro se and represented litigants alike.  In fact, it is clear from the record that the

trial court took great care to address in detail all evidentiary matters raised by Petitioner, even

those which might have been resolved in a more perfunctory manner.  Similarly, the record

shows that the court's admonitions to Petitioner were few and far between, even though

Petitioner at times persisted in ignoring the court's rulings pertaining to what evidence could be

admitted or argued to the jury, or the proper demeanor to be used when questioning a witness,

such as the minor victim Jane Doe."  (See Section 4(c), supra.)

Petitioner has failed to allege any instances of judicial misconduct which rendered his

trial fundamentally unfair.  Accordingly, the state court's rejection of this claim was not contrary

to, or an unreasonable application of, clearly established federal law, and this claim for habeas

corpus relief is denied.

8.  Juror Misconduct

a.  Background

Petitioner raises two claims of juror misconduct.

His first claim is that the jurors committed misconduct by nodding and smiling at the

prosecutor when they entered and left the courtroom.  This claim (as well as the related claim that

the prosecutor committed misconduct by nodding and smiling at the jurors) was addressed at the

post-trial hearing on Petitioner's motions for a new trial and for a mistrial.  After hearing

argument from Petitioner, the trial judge responded to his assertions as follows:

> On the [] issue as to whether or not Mr. Barni committed an act of misconduct and
> whether the jury committed an act of misconduct by nodding to Mr. Barni as they
> entered into the courtroom and as they filed out of the courtroom, you are correct
> in your assertion that I personally viewed this.  I did in fact view this.  You are
> correct.  It did occur.  However, I would point out to you, Mr. Hardaway, that it
> occurred in conformance with my original order to the jury that they were to have
> no oral contact with any of the parties, litigants, attorneys or any -- anyone in this
> court other than the court staff, and I instructed them at the outset of the trial that
> if they were to see Mr. Barni, any of the witnesses or any of the litigants or parties
> in the hallways or even in the courtroom during the pendency of this trial that they
> were not to engage him in conversation and that they were to nod politely.
>
> I interpreted both Mr. Barni's act as well as the act of the jurors of nodding
> politely to be acts of common courtesy in greeting each other because they were in
> the same courtroom for a period of several weeks together, and it was solely an act
> of politeness and courtesy.  There was no intended communication.  I did not
> interpret this to be any subtle kind of attempt to influence on either side.  It was
> solely a matter of courtesy that was demonstrated in open court.

RT 815-16.  The judge also noted that she had seen some of the jurors nod to Petitioner as well.

RT 816, 817.  The judge denied Petitioner's motions.

Petitioner's second claim of juror misconduct is based on the claim previously raised by

Petitioner as one of prosecutorial misconduct, that is, that the jurors improperly focused their

1   attention on the prosecutor when the judge was out of the courtroom during a readback of

2   testimony, and they did not inform the judge that the prosecutor had told them to direct any

3   questions to him.

4

5             b.      Applicable Federal Law

6         The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of

7   impartial jurors.  U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961).  "Even if

8   only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to

9   an impartial jury."  Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations

10  omitted).  However, the Constitution "does not require a new trial every time a juror has been

11  placed in a potentially compromising situation."  Smith v. Phillips, 455 U.S. 209, 217 (1982).

12  The safeguards of juror impartiality, such as voir dire and protective instructions from the trial

13  judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence

14  that might theoretically affect their vote.  Id.  Due process only means a jury capable and willing

15  to decide the case solely on the evidence before it and a trial judge ever watchful to prevent

16  prejudicial occurrences and to determine the effect of such occurrences when they happen.  Id.

17  Such determinations may properly be made at a hearing, which is sufficient to satisfy due

18  process.  Id.

19

20        On federal habeas corpus review, a state court's factual findings are entitled to deference,

21  and habeas relief will not be warranted unless the federal court concludes that the state court's

22  adjudication of the claim "resulted in a decision that was based on an unreasonable determination

23  of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.

24  § 2254(d)(2).

25             c.      Analysis

26

With respect to Petitioner's first claim of juror misconduct, the trial court held a hearing at which it found that the jurors did nod and smile to the prosecutor upon entering and leaving the courtroom.  The court also found that some of the jurors nodded at Petitioner.  The court concluded that the nods and smiles were "acts of common courtesy," taken in accord with the court's instructions to the jury, and found that there had been no attempt at influence on either side.  The record shows that this was not an unreasonable determination of the facts in light of the evidence before the court, and the court's conclusion that no misconduct occurred was not contrary to, or an unreasonable application of, clearly established federal law.

With respect to Petitioner's second claim of juror misconduct based upon the readback which occurred outside of the judge's presence, earlier in this order this Court rejected Petitioner's characterization of the record.  In any event, there is no evidence that any juror ever spoke with the prosecutor.

For these reasons, Petitioner's juror misconduct claims are denied.

9.    Insufficient Evidence

a.    Background

Petitioner claims that the evidence was insufficient to support his conviction.  In so doing, he points out inconsistencies in witness testimony about the descriptions of his clothing, his teeth, and the timing relating to his alibi defense.

b.    Applicable Federal Law

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  A federal court reviewing a claim of insufficient evidence in a habeas petition does not determine whether it is satisfied that the

evidence meets the reasonable doubt standard.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).

The federal court "determines only whether, 'after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.'"  See id. (quoting Jackson v. Virginia, 443 U.S. 307, 319

(1979)).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable

doubt, may the writ be granted.  See Jackson, 443 U.S. at 324.

The prosecution need not affirmatively rule out every hypothesis except that of guilt.

Wright v. West, 505 U.S. 277, 296-97 (1992).  The existence of some small doubt based on an

unsupported yet unrebutted hypothesis of innocence therefore is not sufficient to invalidate an

otherwise legitimate conviction.  See Taylor v. Stainer, 31 F.3d 907, 910 (9th Cir. 1994).

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  If confronted by a record that

supports conflicting inferences, a federal habeas court "must presume – even if it does not

affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of

the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  Except in the most

exceptional of circumstances, Jackson does not permit a federal habeas court to revisit credibility

determinations.  See id.

After AEDPA, a federal habeas court applies the standards of Jackson with an additional

layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  Generally, a federal

habeas court must ask whether the operative state court decision reflected an unreasonable

application of Jackson and Winship to the facts of the case.  Id. at 1275 (quoting 28 U.S.C.

§ 2254(d)).

       c.     Analysis

Petitioner's claim of insufficiency of the evidence does not go to the question whether the evidence presented at trial was sufficient to establish the elements of the crimes. Rather, he argues the weight of the evidence, that is, he reasserts the reasons why the jury should not have credited the witnesses and evidence presented by the prosecution.

This Court has independently reviewed the record and concludes that after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. Jane Doe's identifications of Petitioner and his clothing, even with their inconsistencies, were strong, and the prosecution ably discredited Petitioner's alibi defense. Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, and this claim for habeas corpus relief is denied.

> 10.    Presentation of Newly Discovered Evidence

>> a.    Background

Petitioner claims that he was denied due process because the trial court did not allow him to present newly-discovered evidence. The specific pieces of evidence he refers to are a video camera tape from the pawn shop dated January 4, 1999, evidence from the report of the sexual assault examination of Jane Doe which shows that she had a scratch under her eye and was depressed because of school, the results of the DNA tests, statements made by Kenitra Frazier in her phone conversation with the prosecutor's inspector, and evidence of statements made to Petitioner by the prosecutor's investigators – Pat Mahaney and Pete Sarna – that would have acquitted Petitioner. Petitioner previously requested an evidentiary hearing from this Court in order to present this evidence. The Court rejected the request because the facts Petitioner wanted the Court to consider were already discovered and presented to the state courts in the underlying

1    state proceedings.

2           b.    Applicable Federal Law

3           "State and federal rulemakers have broad latitude under the Constitution to establish rules

4    excluding evidence from criminal trials." Holmes v. South Carolina, 126 S. Ct. 1727, 1731

5    (2006) (quotations and citations omitted); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996)

6    (due process does not guarantee a defendant the right to present all relevant evidence).  This

7    latitude is limited, however, by a defendant's constitutional rights to due process and to present a

8    defense, rights originating in the Sixth and Fourteenth Amendments.  See Holmes, 126 S. Ct. at

9    1731.  "While the Constitution [] prohibits the exclusion of defense evidence under rules that

10   serve no legitimate purpose or that are disproportionate to the ends that they are asserted to

11   promote, well-established rules of evidence permit trial judges to exclude evidence if its

12   probative value is outweighed by certain other factors such as unfair prejudice, confusion of the

13   issues, or potential to mislead the jury."  Id. at 1732; see Egelhoff, 518 U.S. at 42 (the exclusion

14   of evidence does not violate the Due Process Clause unless "it offends some principle of justice

15   so rooted in the traditions and conscience of our people as to be ranked as fundamental.").

16          c.    Analysis

17          Although Petitioner alleges that he was denied the right to present newly-discovered

18   evidence at trial, it is clear from his assertions and from the record that the evidence to which he

19   was refers was in existence (or alleged existence, as in the case of the DNA test results) prior to

20   or at the time of trial.  Thus, Petitioner's claim is more aptly characterized as a challenge to the

21   trial court's evidentiary rulings, and to what he maintains was the withholding of evidence from

22   him by the prosecution.  The latter assertion has already been rejected by this Court in its earlier

23   discussion of Petitioner's prosecutorial misconduct claim.

Petitioner's objections to the trial court's evidentiary rulings also fail.  The statements made by Kenitra Frazier and the prosecutor's inspectors were inadmissible hearsay, and Petitioner has provided no grounds for their admissibility.  Petitioner did not call either the doctor who examined Jane Doe or Jane Doe's mother as witnesses, and he does not explain how the reports of their statements would otherwise be admissible.  Petitioner has not established that a video tape from the camera at the pawn shop exists for January 4, 1999, or that it shows his presence at the pawn shop at the time he claims to have been there.  Petitioner also has not established the existence of any DNA test results.

Petitioner has also failed to show that the trial court's evidentiary rulings deprived him of his right to present a defense.  He testified at length at trial and presented evidence to support his claim that he was at the pawn shop when Jane Doe was attacked.  He has not shown how the evidence at issue would have benefitted him further, other than by way of speculation.

The state court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law.  Accordingly, this claim for habeas corpus relief is denied.

     11.    <u>Ineffective Assistance of Appellate Counsel</u>

        a.    <u>Background</u>

Petitioner claims that appellate counsel was ineffective because he failed to file a writ in conjunction with the appeal to raise issues and grounds not on the record.  None of the claims raised in Petitioner's federal habeas corpus petition were raised by counsel on appeal.  However, they were raised by Petitioner in a pro se state habeas petition that was addressed by the court of appeal in conjunction with the appeal.  The court ruled:

Defendant's self-submitted petition claims various denials of due process couched in nine "grounds" plus a final ground of ineffective assistance of counsel for not

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

raising these issues in the appeal briefing.  Having reviewed the petition and found no prima facie case for relief stated, we deny it without need to order an evidentiary hearing.  [Citation omitted.]

Exhibit G at 10.

        b.     Applicable Federal Law

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  See Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  A petitioner therefore must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  Id. at 1434 & n.9 (citing Strickland, 466 U.S. at 688, 694).

Appellate counsel does not have a constitutional duty to raise every non-frivolous issue requested by a defendant.  See Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997).  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  See Miller, 882 F.2d at 1434. Appellate counsel therefore frequently will remain above an objective standard of competence and have caused his client no prejudice for the same reason – because the issue he declined to raise was weak.  See id.

        c.     Analysis

Petitioner's argument that appellate counsel failed to raise crucial issues on appeal is grounded on his assertion that he informed counsel "of all relevant matters that occurred outside of the record."  Petition at 17.  He then reasserts the factual underpinnings of the claims that he

raises in this petition.  For the reasons discussed in this order, however, Petitioner's claims are without merit.  He therefore cannot show that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.

Petitioner's claim that appellate counsel should have filed a state habeas corpus petition in conjunction with his appeal also does not present a claim for federal relief, because there is no federal constitutional right to counsel on state collateral review.  See Coleman v. Thompson, 501 U.S. 722, 755-57 (1991).  In any event, Petitioner did present his claims by way of his pro se state habeas petition, and they were considered and rejected by the court of appeal.

The state court's rejection of Petitioner's ineffective assistance of appellate counsel claim was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim for habeas corpus relief is denied.

## CONCLUSION

The Court concludes that Petitioner has failed to show any violation of his federal constitutional rights in the underlying state criminal proceedings.  Accordingly, the petition is denied.  The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: _11/2/06_____

_____
JEREMY FOGEL
United States District Judge

1

2    This is to certify that on _____11/3/06_____, a copy of this ruling was

3    mailed to the following:

4

5    Sonny Ray Hardaway
     P-45579

6    CA State Prison - Corcoran
     P.O. Box 3466

7    Corcoran, CA  93212

8

9    Frances Marie Dogan
     CA State Attorney General's Office

10   455 Golden Gate Avenue, Suite 11000

11   San Francisco, CA  94102-7004

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28